UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:20-cr-103 (KAD) |
| | : | |
| v. | : | |
| | : | |
| CHRISTOPHER RASCOLL | : | August 19, 2021 |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

*To this day, each time my phone beeps with a new text message I panic. . . . I have been in a constant [state] of anxiety since this began. My doctor had to put me on anti-anxiety medication because I still have nightmares.. . . . When I leave the house, I cannot be alone . . . I was unable to work for fear that he would [] follow me . . . , and my life would be at risk. . . . I will never feel safe. He knows where I live, and there will be nothing stopping him. He has taken so much from me already, please don't let him take anymore.*

The Victim, Letter to the Court.

I.    **INTRODUCTION**

For seven months, the Victim in this case lived in absolute fear that Mr. Rascoll would kill her. He tormented her with threats to turn her house into a gas chamber, blow up her car, beat her with a bat, and shoot her in the head with a semi-automatic weapon. He posted on social media about owning a gun, lending credence to his threats. He targeted her based on her religion, including anti-Semitic references in his violent language. The Victim will never again feel safe, either inside or outside of her home.

The Government does not dispute that Mr. Rascoll has mental health issues that need to be addressed. But his mental health issues cannot trump the Victim's safety. Indeed, he has only more incentive to target her now, given that she was the impetus for this federal conviction. The Government thus respectfully requests a sentence at the high end of the Guidelines range (21

months, as calculated in the plea agreement),[1] followed by a three-year period of supervised release, with the first year to be served in a structured living environment such as a halfway house, and conditions that include mental health and substance abuse treatment.

## II.     FACTUAL BACKGROUND

### A.  The Offense Conduct

Mr. Rascoll has a significant history of threatening, harassing, and terrorizing innocent people.  Between 2015 and 2017, eleven orders of protection had been entered against Mr. Rascoll. The FBI has identified six people, including the Victim, that have been targeted by Mr. Rascoll in the past two years. According to the Presentence Report ("PSR"), Mr. Rascoll presently has two outstanding warrants for his arrest for threatening and harassing conduct. PSR ¶¶ 68, 69.

In this case, Mr. Rascoll tormented the Victim, who lives in a 55+ community in Stratford, Connecticut, where Mr. Rascoll's mother lived at one point. When the Victim met Mr. Rascoll at the community's pool in the summer of 2019, she was completely unaware of Mr. Rascoll's disturbing history.  Over the course of the summer, the Victim and Mr. Rascoll had multiple conversations at the pool, during which the Victim shared stories about her life and, notably, her Jewish faith.  Mr. Rascoll told the Victim that he felt trapped in his mother's home and was frustrated that his mother would not let him drive her car. At one point that summer, Mr. Rascoll gave the Victim his email address, but they never interacted outside of the pool area. The last time the Victim saw Mr. Rascoll at the pool was in August of 2019.

---

[1] As discussed below, the Government may seek to deny Mr. Rascoll credit for acceptance of responsibility, given that he has taken the position in his sentencing memorandum that the three-level increase for intentionally targeting the Victim based on her religion should not apply (despite his plea to the Fair Housing Act hate crime).

On November 24, 2019, for reasons unknown, the Victim became his next target. On that day, Mr. Rascoll made a Facebook post about the Victim: "[Y]ou're not powerful, you're not Jewish, . . .and you're not human. You will surrender before 11:00am tomorrow, . . .or you will be forced out of your home and community by the law. You will be forced out of [community name]. This is your final warning before a war erupts.[2]" On November 30, 2019, less than one week later, Mr. Rascoll was arrested for stealing his mother's car.

On December 23, 2019, the first day of Hanukkah, Mr. Rascoll's threats toward the Victim escalated. This time, he texted the Victim through OpenTextingOnline.com, a free Internet site, sending her a series of explicitly Anti-Semitic threats:

> Wouldn[']t want to see you get humiliated and crushed. That back of yours couldn[']t take it . . . Suns about to go down. **It would be a shame if your house were used to light the menorah. Or turned in a gas chamber.** It would be just HORRIBLE if you slipped and fell and had to go to the Hospital. If they even take you. You might bring in diseases. . . And you ARE skating on VERY thin ice without a helmet.

(Emphasis added.)  After receiving the above messages and multiple others, the Victim bravely reported the threats the Stratford Police Department who, among other investigative steps, interviewed Mr. Rascoll's mother.

After the Victim went to the police, she received more threatening messages from Mr. Rascoll. Many of the new messages explicitly threatened the Victim because she had reported the threats to law enforcement:

---

[2] All of the text messages, voicemails, and social media posts cited are excerpts, unless stated otherwise.

- "Bye, Shorty.  Enjoy your swim time with the FBI, CIA, and ATF.  Bring your swimmies." (2/5/2020)

- The following images (2/7/2020):



- "Run your mouth again and it will be wired shut.  Guaranteed." (3/23/2020)

On April 3, 2020, Mr. Rascoll posted:  "Just bought my first gun" on his Facebook account.

He then sent the Victim the following two messages from a phone number subscribed to him:

- "Tell the truth and surrender or pack your bags and be gone from [housing community]. So surrender before you get killed. If I have to come to your house I will." (4/3/2020)

- "You can't win at this.  So surrender before you get killed.  You're literally a nobody.  If I have to come to your house I will.  Seriously.  You're just a small time South Jersey NOBODY.  TINY.  TINY. … Tell the truth and surrender or pack your bags and be gone from [housing community] by Monday.  Police can't and won't help you nor will the residents or the condo board. … Call all Three State Police agencies, Stratford PD, and the FBI.  You're out by Monday or your problems will only get worse." (4/3/2020)

4

On April 8, 2020, the first day of Passover, Mr. Rascoll sent the Victim another series of threatening, Anti-Semitic text messages. This time, he told the Victim that he would put her in an oven, shoot her, burn down her house with her in it, or send her to a concentration camp if she did not leave her home.  These messages were charged in Count One of the Indictment as a violation of 42 U.S.C. § 3631.

> Seriously you cunt. I'm going to kill you. You better be gone because if you're in [Victim's housing community] Easter weekend **I'm going to stick you in an oven**. Or I'm going to shoot you. You're very TINY nobody. **I will burn your house down with you in** it you fucking trash cunt. I will kill you. Please go back to Jersey before I shoot you and burn you in the Pine Barrens.[3] Please call the police. I dare you b. I'm back in [Victim's housing community] this weekend and you're dead if you're there. **I should send you to a concentration camp.**

(Emphasis added.) Over the next two days, Mr. Rascoll continued to send the Victim text messages saying that he was going to blow up her car and shoot her. On April 10, after sending threatening text messages earlier in the day, Mr. Rascoll left voicemail on the Victim's phone stating: "I'll blow your fucking car up. You'll know what fucking Auschwitz is like. You claim to be Jewish? You're not a Jew. You're a disgrace. You're Satan. I will blow your house and your car up. I will fucking kill you."

In May and June 2020, Mr. Rascoll continued to send the Victim disturbing text messages:

- "Bitch I'm coming up there this week and I'm gonna shoot you in your fucking head. . . . I will fucking KILL U U SKANK WHORE CUNT. . . . ILk [sic] blow your fucking car and house up . . . You're out. I'm gonna shoot you in your head. . . Say your goodbyes [sic] to your family." (5/5/2020).  These messages were charged in Count Two of the Indictment as a violation of 18 U.S.C. § 875(c).

---

[3] The Pine Barrens is a million-acre forest located in New Jersey. Stories exist about mob murder victims being buried in the forest because of its remoteness. The Victim previously told Mr. Rascoll about her childhood growing up in New Jersey.

5

- "You're gonna die. I'll blow your fucking house and car up.  U can't touch me. Legally or otherwise.  Call the police. I fucking DARE YOU TO. . . . I'm back in this weekend. Whether you or my mother like it or not. I'll shoot you d[e]ad in front of a cop." (5/19/2020).  These messages were charged in Count Three of the Indictment as a violation of 18 U.S.C. § 875(c).

- "I'm on my way to [housing community] now so you better be gone . . . . Vacate before you get beat up in front of your son and 'husband.' And it WILL HAPPEN." (6/4/2020).

On May 29, 2020, a United States Magistrate Judge authorized a criminal complaint and warrant for Mr. Rascoll's arrest. On June 1, 2020, the FBI attempted to locate Mr. Rascoll, but was unsuccessful. Mr. Rascoll was homeless and moved from place, which made him very difficult to find.

On the morning of June 26, 2020, the case agent, along with other members of law enforcement, traveled from Connecticut to New York City in another attempt to locate and arrest Mr. Rascoll.  While they waited at his homeless shelter for his return, the Victim received the following disturbing voicemail from Mr. Rascoll:

> You better be gone by tomorrow. I'm coming in. I don't care if you like it or you don't. The police are not going to help you. The courts are not going to help you. . . . You can't hurt me legally or otherwise. Anything you have to say is null and void. You better be gone by tomorrow because if you're not I'm going to break your fucking door down and I'm gonna hit you over the head with a fuckin' bat. . . . I will kill you. If you go near my mother's house, if you go near my mother, if you go near anybody that has anything to do with us, any of our personal records, anything that is financially and legally classified by the government I will fuckin' kill you. I will shoot you in your fuckin' head.

These messages were charged in Count Four of the Indictment as a violation of 18 U.S.C. § 875(c).  Mr. Rascoll was arrested later that day.

## B.  Other Victims

The Victim was not Mr. Rascoll's only target.  Over the last few years, he has also threatened and harassed multiple other people. The PSR accurately recounts Mr. Rascoll's threatening and harassing conduct that he directed towards five other people, Individual 1, Individual 2, Individual 3, Individual 4, and Individual 5. Although not victims of the charged conduct, Individual 1, Individual 2, Individual 3, Individual 4, and Individual 5 are nonetheless victims of Mr. Rascoll, and his conduct towards them should be considered as part of Mr. Rascoll's history and characteristics under 18 U.S.C. § 3553(a).

Mr. Rascoll's threats and harassment of Individual 3 are particularly significant. Around the time that he met the Victim, Mr. Rascoll began posting threatening messages about Individual 3 on social media. Individual 3 was a tenant in a house formerly owned by Mr. Rascoll's aunt. Apparently, Mr. Rascoll believed that he was going to inherit the house when his aunt died in 2016.  But it was bequeathed to other family members, who leased it to Individual 3.

In one post on social media, Mr. Rascoll stated he was going to kill Individual 3 because Individual 3 was living in "his" house. The Orangetown Police Department contacted Mr. Rascoll about the threats. Mr. Rascoll told the officer that he did not mean to follow through on the threats and that he would stop.  In an effort to protect himself and his family, Individual 3 purchased a security camera system for the home, and the police provided a description of Mr. Rascoll's vehicle to Individual 3, in case Mr. Rascoll came to the house. Mr. Rascoll never came to the home, but the social media threats did not stop.

In January 2020, Individual 3 obtained an order of protection against Mr. Rascoll. On February 6, 2020, Mr. Rascoll wrote the following post on his Facebook account: "[Victim 3].

Out. Today. Because I will break the door down. Go ahead. Call a cop. Bring it on." On April 10, 2020, fearing his safety and the safety of his family, Individual 3 moved out of the home.

### C.  Continuing Threats & Harassment While Detained

After being arrested and charged in instant matter, Mr. Rascoll continued to harass and threaten people.  The only thing that changed was his method of doing so.  Because he was detained and without his cell phone and computer, Mr. Rascoll resorted to communicating threats the old-fashioned way, by sending letters.

For example, in September 2020, Mr. Rascoll sent Individual 2 a letter stating: "And yellow represents a traffic signal. It means slow the fuck down and prepare to stop because this is your last fucking warning you little pussy nigger, yup. You're a little girl, a pussy, and a nigger." Since being detained at Wyatt, Mr. Rascoll has sent letters to at least four people. The Government is not aware of any letters that Mr. Rascoll sent or attempted to send to the Victim. But some of the letters contain references to the Victim. In one such letter, the Victim's nickname appears with a notation of " --- gas."

The Government learned about the letters because multiple recipients contacted the FBI, stating that letters were concerning and unwanted.  Upon receiving this this information, counsel for the Government spoke to Mr. Rascoll's attorney and requested that Mr. Rascoll stop sending the unwanted letters.  The Government's requests did not deter Mr. Rascoll.  He continued to send unwanted and threatening letters up until one month before he pleaded guilty in the instant case on April 27, 2021.  In a letter postmarked March 26, 2021, addressed to Individual 4 but sent to Individual 5 Mr. Rascoll wrote: "It smells like a concentration camp! And [*Individual 5* is] Adolph Hitler. They'll probably find him dead soon."

III.   **PROCEDURAL HISTORY**

On June 26, 2020, Mr. Rascoll was arrested on a federal criminal complaint charging him with threatening communications in violation of 18 U.S.C. § 875(c) and interference with housing rights in violation of 42 U.S.C. § 3631(a), a federal hate crime.

On July 8, 2020, a Grand Jury in New Haven returned an Indictment against Mr. Rascoll, charging him one count of interference with housing rights, in violation of 42 U.S.C. § 3631(a), and three counts of threatening communications, in violation of 18 U.S.C. § 875(c).

On April 27, 2021, after entering into a written plea agreement with the United States, Mr. Rascoll pleaded guilty to Count One of the Indictment, charging him with interference with housing rights, in violation of 42 U.S.C. § 3631(a), and Count Two of the Indictment charging him with threatening communications, in violation of 18 U.S.C. § 875(c).

Mr. Rascoll has remained detained since his arrest.

IV.   **THE GUIDELINES CALCULATION**

A.  **Plea Agreement and PSR Calculations**

The parties' plea agreement and the PSR agree on the appropriate guidelines calculations. For Count One, the base offense level is 12, pursuant to U.S.S.G. § 2A6.1(a)(1).  *See* U.S.S.G. § 2H1.1(a)(1).  That level is increased by two because the offense involved more than two threats, pursuant to U.S.S.G. § 2A6.1(b)(2).  Additionally, in the plea agreement, the parties agreed that three levels are added under U.S.S.G. § 3A1.1(a) because the defendant intentionally selected the victim because of her actual or perceived religion (hereafter, the "hate crime enhancement").  The resulting offense level is 17.  Counts One and Two are grouped, U.S.S.G. § 3D1.2, resulting in an offense level of 17.  The parties and PSR agree that Mr. Rascoll falls into Criminal History Category ("CHC") I.

9

As discussed further below, Mr. Rascoll has now taken the position that the hate crime enhancement does not apply.  Counsel for the Government alerted Mr. Rascoll's counsel that, if Mr. Rascoll persists in this position at sentencing, the Government will seek to deny Mr. Rascoll credit for acceptance of responsibility because he will have taken a position which, "in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility" for Fair Housing Act hate crime charged in Count One.  *See* Plea Agreement, Docket #35, at 4.

If Mr. Rascoll persists in this argument and the Court finds that the hate crime enhancement applies and does not grant him credit for acceptance of responsibility, an offense level 17 and CHC I result in an advisory Guidelines range of 24-30 months' imprisonment.  If Mr. Rascoll withdraws his argument and the Court finds that the hate crime enhancement applies and grants him credit for acceptance of responsibility, an offense level 14 and CHC I result in an advisory Guidelines range of 15-21 months' imprisonment.

### B.  Applicability of Hate Crime Enhancement

The three-level hate crime enhancement under U.S.S.G. § 3A1.1(a) is appropriate because Mr. Rascoll "intentionally selected" the Victim because of her religion. U.S.S.G. Section 3A1.1(a) provides:

> If the finder of fact at trial or, in the case of a plea of guilty . . . the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by **3** levels.

As the Second Circuit has explained, "[t]he hate crime enhancement applies if the defendant 'intentionally selected any victim' on the basis of one of the factors listed [in] § 3A1.1(a), and, because there can be no 'good reasons' for doing so, the underlying motivation

10

is simply beside the point." *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 154 (2d Cir. 2008). *See also United States v. Taubert*, 810 F. App'x 41, (2d Cir. 2020) (Section 3A1.1(a) enhancement applied following jury convictions for threatening former President Obama and Congresswoman Maxine Waters where the defendant's phone calls targeting the African American officials and "were laden with racial epithets"); *United States v. Smith*, 365 F. App'x 781, 783 (9th Cir. 2010) (Section 3A1.1(a) enhancement applied following jury conviction of interfering with housing rights in violation of 42 U.S.C. § 3631(a) where the white defendant used offensive language and racial slurs and threatened to hang the African American victim as well as "throw a "Molotov cocktail" at his house, burn a cross on his lawn, and rape and assault his wife").

If the trier of fact determines beyond a reasonable doubt that a defendant intentionally selected a victim because of the victim's actual or perceived race, color, religion, or other enumerated characteristic, application of the 3-level enhancement is mandatory. *See United States v. Weems*, 517 F.3d 1027, 1030 (8th Cir. 2008) (vacating and remanding sentences of defendants that did not apply the Section 3A1.1 enhancement, where defendants were convicted at trial of conspiring to threaten and intimidate an African American man in the exercise of his housing rights because of his race but were acquitted of cross burning incident related to race).

Mr. Rascoll's conduct here demonstrates that he intentionally selected the Victim from the particular anti-Semitic threats against her because of her religion. Importantly, among the many people Mr. Rascoll has threatened over the years, his threats to the Victim contained the most graphic, repeated, and specific references to her religion and to atrocities against Jewish people

committed during the Holocaust.[4]

Mr. Rascoll's other victims have generally been people with whom he had some sort of longstanding relationship (such as Individual 1, whom he met in AA more than 20 years ago; Individual 2, who is a high school acquaintance of Mr. Rascoll's; and Individual 6, who was a former employer of Mr. Rascoll's) or whom he believed had wronged him (such as Individual 3, whom Mr. Rascoll believed was living in the home Mr. Rascoll believed would be bequeathed to him).

The Victim, on the other hand, had merely a few conversations with Mr. Rascoll, during which she shared with him only a few basic facts about herself: that she was Jewish, that she suffered from back pain, and that she was from New Jersey.  Mr. Rascoll chose to exploit the most personal of those characteristics, her religion, with language that evoked the horrors of the Holocaust on days that are holy in the Jewish faith:

- On December 23, 2019, **the first day of Hanukkah,** Mr. Rascoll sent the Victim the following texts that read in part: "Suns about to go down. **It would be a shame if your house were used to light the menorah. Or turned in a gas chamber**. It would be just HORRIBLE if you slipped and fell and had to go to the Hospital. If they even take you. You might bring in diseases. . . . And you ARE skating on VERY thin ice without a helmet." PSR ¶ 9.

- On April 8, 2020, **the first day of Passover,** Mr. Rascoll sent the Victim the following texts that read in part: "Seriously you cunt. I'm going to kill you. You better be gone because if you're in [Victim's housing community] Easter weekend **I'm going to stick you in an oven**. Or I'm going to shoot you. You're very TINY nobody. I will burn your house down with you in it you fucking trash cunt. I will kill you. Please go back to Jersey before I shoot you and burn you in the Pine Barrens. Please call the police. I dare

---

[4] On August 19, 2021, the Government submitted to the United States Probation Office a victim impact letter from another individual ("Individual 6") Mr. Rascoll threatened, who references anti-Semitic language Mr. Rascoll used against her.  Specifically, she says that Mr. Rascoll told her he was going to "force [her] into an oven like [her] relatives."  This reference, along with the March 26, 2021, letter Mr. Rascoll sent from Wyatt addressed to Individual 4 but sent to Individual 5 that references a concentration camp, demonstrates a pattern of hateful anti-Semitic remarks.

you b. I'm back in [Victim's housing community] this weekend and you're dead if you're there**. I should send you to a concentration camp."** PSR ¶ 19.

- On April 9, 2020, Mr. Rascoll left the Victim's voicemail a message which he stated the following: "I'll blow your fucking car up. **You'll know what fucking Auschwitz is like. You claim to be Jewish? You're not a Jew. You're a disgrace. You're Satan.** I will blow your house and your car up. I will fucking kill you." PSR ¶ 21.

These statements directly threaten the Victim based on her religion, which was one of the minimal facts Mr. Rascoll knew about her. He has no longstanding history with her, as with other victims he has harassed over time. The evidence thus demonstrates, beyond a reasonable doubt, that he intentionally selected her because he could mount against her an intensely personal and terrifying barrage of threats based on her Jewish faith.

Moreover, Mr. Rascoll's guilty plea to the Fair Housing Act violation itself incorporates an element of acting "on account of" the Victim's religion and occupancy of a dwelling. The elements of 42 U.S.C. § 3631(a), specifically the third element, encompass the conduct described in the hate crime enhancement:

> (1) the defendant used force or threat of force; (2) the defendant intimidated or interfered with, or attempted to intimidate or interfere with, an enumerated housing right [here, the victim's right to occupy a dwelling]; (3) **The defendant acted on account of the** race, color, sex, **religion**, disability, family status, or national origin **of any person and on account of the victim's** enjoyment or **occupancy of the dwelling**; (4) the defendant acted knowingly and willfully; and (5) the defendant threatened to use a dangerous weapon, explosives, or fire.

Plea Agreement at 1.

The Second Circuit has explained that "[a] guilty plea is an unconditional admission of guilt and constitutes an admission of all the elements of a formal criminal charge. As to those elements the plea is "as conclusive as a jury verdict." *United States v. Rosen*, 409 F.3d 535, 549 (2d Cir. 2005) (internal quotations and citations omitted). By pleading guilty to Count One of the

Indictment, Mr. Rascoll admitted that he acted "on account of" the Victim's religion, which is highly relevant—if not dispositive—of the question of whether "intentionally selected" the Victim because of her religion, as required to apply the hate crime enhancement.  Further, in the stipulation of offense conduct and relevant conduct, Mr. Rascoll stipulated that he sent the Victim a text message saying that he was going to stick her in an oven, shoot her, burn her body, or put her in a concentration camp if she did not leave her residence "because of the Victim's religion and because the Victim was occupying a dwelling."  Plea Agreement at 10.  Mr. Rascoll has not sought to withdraw his plea.  As such, Mr. Rascoll's admissions in the plea agreement and in his interview with the United States Probation Office, *see* PSR ¶ 44, demonstrate that the hate crime enhancement should apply.

The Government does not quarrel with the idea that Mr. Rascoll faces mental health challenges, including paranoia, and that those considerations may be relevant to the Court's ultimate sentence.  But, after pleading guilty to a hate crime targeting the Victim because of her religion, and agreeing that the hate crimes enhancement applies, Mr. Rascoll's present claims that "there is no evidence, substantial or otherwise, that Mr. Rascoll targeted the Victim because of her religion," and that he targeted her in self-defense because he believed she worked for a gang that was looking to harm him, *see* Defendant's Sentencing memo at 3-4, is simply incredulous.

In the parties' plea agreement, the Government reserved its right to "seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his guilty plea or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility."  *See* Plea Agreement, Docket #35, at 4.  In the Government's view, Mr. Rascoll's position that the hate crime enhancement does not apply is inconsistent with affirmative acceptance of personal responsibility for the conduct alleged in Count

14

One of the Indictment, to which Mr. Rascoll pleaded guilty.  Indeed, he seems to be denying one of the essential elements of the offense.  If Mr. Rascoll persists in his argument that the hate crime enhancement does not apply, the Government will seek denial of credit for acceptance of responsibility, leading to a Guidelines range of 24-30 months' incarceration, rather than 15-21 months' incarceration, as agreed in the plea agreement.

## V.    DISCUSSION OF 3553(a) FACTORS

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Government highlights what it views as the most significant of the § 3553(a) factors below.

### A.  Nature, Circumstances, and Seriousness of the Offense

The seriousness of the Mr. Rascoll's offense, as evidenced by the harm he threatened to cause—and caused—supports a very significant sentence. For seven months, Mr. Rascoll terrorized the Victim. Mr. Rascoll threatened the Victim because she was Jewish and living in her home, the very place where a person should feel the safest.  On the first day of Passover, Mr. Rascoll sent the Victim texts saying that if she did not leave her home, he would put her in an oven, shoot her, burn down her house with her in it, or send her to a concentration camp.  Mr. Rascoll also sent the Victim countless other messages in which he detailed how he would assault the Victim if she did not leave her home. PSR ¶ 21 ("I'll shoot you in the head with a semi-automatic"); PSR ¶ 22 ("I'll break your skull open with a golf club."); PSR ¶ 25 ("I'm going to break your legs"); PSR ¶ 27 ("Vacate before you get beat up in front of your son and 'husband.'"). Mr. Rascoll further degraded the Victim by repeatedly telling her that she was a "nobody." and was not even human. PSR ¶¶ 8, 10. The Victim repeatedly went to the police to report Mr. Rascoll's threats, but he was undeterred. Mr. Rascoll told the Victim that the "[p]olice can't and won't help" her. PSR ¶ 17. He told the Victim that he would shoot her in front of a cop. PSR ¶ 22.

The harm Mr. Rascoll has caused is tremendous. The Victim's life has been turned upside down. Mr. Rascoll's actions have caused her both lasting mental and physical pain.  As she noted to the Court in her victim impact statement:

> To this day, each time my phone beeps with a new text messages I panic.  Since the phone calls began, I can no longer answer a phone number that I do not recognize.  I have been in a constant state of anxiety since this began. … When I leave the house, I cannot be alone, my husband or my friends must go with me.  On the rare occasion I must walk by myself, I let people know when I am

16

leaving to meet them so they will know if I don't get to my destination. …

I work for GrubHub. I am always driving around, and I was unable to work for fear that he would either follow me or that he may have placed the order and I would inadvertently be delivering something to him, and my life would be at risk. Even after Mr. Rascoll was arrested, I was still too nervous to work for months.

This has been incredibly difficult on my family. My husband would do anything to protect me ,and he is no on guard all the time and it has greatly affected him. I was afraid for my son and his girlfriend who had been quarantining with us that something could happen to them. …

Mr. Rascoll has shown no signs of remorse. He has been able to write letters to others, and he has been referencing me which makes me believe that upon his release, he will continue to torment me. I have no confidence that he has any intention of stopping this behavior. …

**I will never feel safe. He knows where I live, and there will be nothing stopping him. He has taken so much from me already, please don't let him take anymore.**

The Victim understandably feared for her life while receiving Mr. Rascoll's threats and will continue to fear for her life upon his release from custody and supervision. The threats were extremely violent and specific, and caused the Victim psychological torture that she will have to work through for the rest of her life.

The seriousness of the offense weighs in favor of a sentence at the high end of the Guidelines range.

### B. Deterrence, Protection of the Public, and Mr. Rascoll's History and Characteristics

A sentence at the high end of the Guidelines range will also help encourage specific and general deterrence and help protect the public from future crimes by Mr. Rascoll.

As the Court is aware, up until one month before he pleaded guilty in the instant case, and

17

while he has been detained, Mr. Rascoll continued to send harassing letters to various individuals, some of which referenced the Victim using a nickname.  The fact that Mr. Rascoll has not sent any letters to the Victim herself demonstrates that incarceration has worked to specifically deter him from contacting her.  But his pre-trial detention has thus far not deterred him from targeting other people from various points in his life, filling their mailboxes with harassing handwritten letters (including some that make reference to a nickname Mr. Rascoll uses for the Victim).  It is the Government's hope that a period of incarceration at the Bureau of Prisons, followed by a long period of supervision that could be served in part in a structured living environment, could deter Mr. Rascoll from continuing to wreak havoc on the lives of so many.

Moreover, Mr. Rascoll's targeting of the Victim based on her Jewish faith—and his recent attempt to disclaim that motivation—is especially pernicious.  According to the FBI's most recent Hate Crime Statistics, 60% of all hate crimes motivated by religious bias were anti-Jewish in nature.  *See*  https://ucr.fbi.gov/hate-crime/2019/topic-pages/incidents-and-offenses (last visited August 19, 2021).  These crimes are incredibly serious, as they strike at the heart of a person's fundamental right to worship as she pleases.  By taking the position that he did not target the Victim because of her religion, he is denying the import of his chosen language on the victim herself and on all members of the Jewish faith who have suffered because of anti-Semitic words and actions.  A significant sentence of incarceration, at the high end of the Guidelines range, would send a message that hateful threats like Mr. Rascoll's have no place in our pluralistic society.

Mr. Rascoll's mental health condition is of obvious relevance to his likelihood of reoffending.  Based on the psychiatric evaluation, it is clear that Mr. Rascoll suffers from mental health conditions that must be managed.  The evaluation recommends treatment and stabilization in an inpatient facility, with a gradual step down to less intensive treatment, but Mr. Rascoll has

18

not proposed a plan of inpatient treatment.  Again, it is the Government's hope that Mr. Rascoll's mental health issues can be managed, either while in custody or during the period of supervised release.  But protection of the Victim, and of the other people that Mr. Rascoll has harassed over time, is paramount.  The Victim does not deserve to live in fear that Mr. Rascoll will show up at her doorstep and kill her.  A sentence at the high end of the Guidelines, followed by a 3-year term of supervised release under strict living and treatment conditions, will help give the Victim some comfort that she is protected.

## VI.    CONCLUSION

For the reasons described herein, the Government respectfully requests that the Court sentence Mr. Rascoll to a sentence of imprisonment at the high end of the Guidelines range, to be followed by a 3-year term of supervised release, the first year of which Mr. Rascoll should reside in a halfway house with strict conditions of mental health and substance abuse treatment.

Respectfully submitted,

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY

/s/
AMANDA S. OAKES
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct30310
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: (203) 821-3700
amanda.oakes@usdoj.gov

19

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on August 19, 2021, a copy of the foregoing document was filed electronically via CM/ECF. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

                                     */s Amanda S. Oakes*
                                     Amanda S. Oakes
                                     Assistant U.S. Attorney